[No. E026362. Fourth Dist., Div. Two. Mar. 27, 2001.]

Adoption of DANIELE G., a Minor.
ROBERT D. et al., Plaintiffs and Appellants, v.
JAIME T., Defendant and Respondent.

[No. E027047. Fourth Dist., Div. Two. Mar. 27, 2001.]

Guardianship of DANIELE G., a Minor.
ROBERT D. et al., Petitioners and Appellants, v.
JAIME T., Objector and Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and III.

**COUNSEL**

Holmes & Holmes, Deborah M. Holmes; John L. Dodd and Lisa A. DeMaria for Plaintiffs and Appellants and for Petitioners and Appellants.

Diamond Law Firm, John J. Diamond and Joseph E. Diamond for Defendant and Respondent and for Objector and Respondent.

**OPINION**

**RICHLI, J.**—This case revolves around the interpretation and application of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216].

When Jaime T. was 20 and Annie G. was 18, they lived together for about a month. After Annie became pregnant with Jaime's child, she moved back in with her parents. Annie wanted to place the child for adoption. Jaime wanted to keep the child; to that end, he filed a paternity petition. When Annie gave birth, she placed Daniele G. with Robert and Tracy D., who filed an adoption petition; Bethany Christian Services, the adoption agency, filed a petition to terminate Jaime's parental rights.

If a man is the presumed father of a child, the child cannot be adopted without his consent (Fam. Code, § 8604, subd. (a)), unless the trial court

finds, on statutorily specified grounds, that he is unfit. (Fam. Code, §§ 8604, subd. (b), 8606.) If, however, he is not a presumed father of a child, the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. (Fam. Code, § 7664, subd. (b).) Jaime did not qualify as Daniele's presumed father. (Fam. Code, § 7611.)

■ In *Kelsey S.*, however, our Supreme Court held that a biological father "has a constitutionally cognizable opportunity interest in developing a relationship with his child." (*Adoption of Kelsey S., supra*, 1 Cal.4th at p. 844.) "The biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full and enduring relationship." (*Id.*, at p. 838.) Accordingly, this "statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id.*, at p. 849.)

The trial court ruled that, under *Kelsey S.*, Jaime had a constitutionally protected interest in an opportunity to form a relationship with Daniele, and therefore the adoption could not proceed without Jaime's consent. The D.'s then filed a guardianship petition instead. The trial court found that granting either Jaime or Annie custody of Daniele would be detrimental to her, and that granting the D.'s custody of Daniele would be in her best interest. Nevertheless, it ruled that, under *Kelsey S.*, Jaime's constitutionally protected interest required it to balance the detriment to the child against the preference for placement with a biological parent. On this basis, it denied the guardianship petition. After a further custody hearing, it granted temporary custody to Annie.[1]

The trial court's finding that Jaime qualified for constitutional protection under *Kelsey S.* is supported by substantial evidence. Accordingly, in the unpublished portion of this opinion, we will affirm its order denying the adoption petition.

The trial court's ruling that Jaime's constitutional protection precluded it from granting the guardianship petition based on detriment alone was

---

[1] At oral argument, the parties advised us that Annie then moved in with the D.'s.

erroneous. Accordingly, in the published portion of this opinion, we will reverse the order denying the guardianship petition.

## I

### Factual Background*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## II

### Procedural Background

In April 1999, Bethany Christian Services gave Jaime notice that Annie was planning to place the child for adoption. On May 6, 1999, Jaime filed a paternity petition in Los Angeles County Superior Court.

On September 1, 1999, Jaime filed an order to show cause (OSC) in the paternity proceeding, seeking custody and/or visitation. The OSC was set for hearing on October 6, 1999.

On September 14, 1999, the D.'s filed an adoption petition in Riverside County Superior Court. Jaime first learned Daniele had in fact been born when his attorney called him to tell him about the adoption proceeding.

On September 21, 1999, Jaime filed an ex parte application in the adoption proceeding, seeking immediate custody. The trial court denied the application because the matter was pending before the court in Los Angeles County.

On October 6, 1999, pursuant to stipulation, the paternity proceeding was transferred to Riverside County. As a result, Jaime's pending custody OSC went off calendar.

On October 29, 1999, Jaime filed a new OSC for custody and/or visitation. On November 16, 1999, the trial court continued the hearing on the OSC; it directed counsel "to discuss visitation outside of [the] courtroom." The D.'s refused to agree to visitation. On December 7, 1999, the trial court consolidated the paternity proceeding with the adoption proceeding; it denied visitation and continued the hearing on Jaime's OSC.

On December 23, 1999, the trial court held an evidentiary hearing on Jaime's paternity petition and on the petition to terminate his parental rights.

---

*See footnote, *ante*, page 1392.

On December 28, 1999, it ruled that Jaime was Daniele's father and that his consent was necessary for her adoption.

III

THE TRIAL COURT'S FINDING THAT JAIME WAS CONSTITUTIONALLY PROTECTED UNDER KELSEY S.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV

THE TRIAL COURT'S DENIAL OF THE D.'S GUARDIANSHIP PETITION

The D.'s contend the trial court erred by denying their guardianship petition.

A.  *Additional Factual and Procedural Background.*

1.  *Additional Evidence.*

On January 13, 2000, Annie filed a petition for the appointment of the D.'s as guardians for Daniele. (Prob. Code, § 1510.) On March 20 through 23, 2000, the trial court held a joint evidentiary hearing on both Jaime's still-outstanding custody OSC and the D.'s guardianship petition.[4]

The D.'s called Dr. Kenneth Fineman as their expert witness. Dr. Fineman was a psychologist specializing in child custody. He had had clinical experience with teenagers and adults who had been taken from a parent at the age of seven months or less.

He testified that Daniele was attached to the D.'s, who were her "psychological parents." She was also attached to the D.'s other children, as her siblings. Removing a child of Daniele's age (then seven months) from his or her psychological parents would cause an "attachment disorder."

"[A]ttachment disorder has short and long-term effects . . . ." "[T]he short-term effects . . . generally are broken down into three phases, the acute phase where the child suffers extreme separation anxiety, the second stage where the child suffers significant despair, . . . and the final stage

---

*See footnote, *ante*, page 1392.

[4]The D.'s had filed a request to consolidate the guardianship proceeding with the paternity/custody proceeding. The record does not reflect any hearing or order on this request. Nevertheless, both sides acted as if the cases had been consolidated, and so did the trial court.

where the child becomes quite detached and has significant difficulty making new attachments.

"[T]he short-term effects . . . involv[e] initially acute anxiety on the part of the child, confusion, significant fear of the new unfamiliar surroundings that the child is brought into. Oftentimes it's described as [the] child is out of his or her mind with fright. They cry, they shake the crib, they throw themselves around.

"They then move on to the next phase which is the phase of despair where they show signs of helplessness, hopelessness, there's a decrease in their physical movements, a deep mourning is quite apparent. They become quite apathetic in their contact with others. They tend to make very little demands initially, and ultimately they have great difficulty in interacting at least initially with whomever they're with. They show significant grief, psychosocial retardation, avoidance of others, gastrointestinal disturbances, depressed mood, withdrawal, anxiety, anger, . . . physical illness, meaning they become much more prone than the average child to become physically ill.

"They become more accident prone than the average child, and the research shows that they have an increased disposition toward infectious disease and an increased susceptibility to trauma, meaning . . . they have become basically a vulnerable child. [¶] . . . [¶]

"[T]he long-term effects . . . [a]re most apparent in late childhood or in adolescence, and that's when we see . . . basically a child who has a loss of trust. . . .

"Inability to form close relationships is the main problem which affects them throughout their life, including young adulthood when they're trying to make marital type bonds. They become, especially in childhood and adolescence, attention seeking, very restless, disobedient, unpopular with peers, they have difficulty becoming independent. They develop an excessive distrust in people in general . . . .

"They expect rejection. Some of them show some subnormal intelligence. . . . [T]hey seem to test below their potential. They're very apathetic kids in adolescence, and they seem to have a predisposition toward depressive illness . . . ."

Dr. Fineman concluded, "[I]t would be extremely detrimental to the child to be removed from [the D.'s] custody."

Jaime called Diane DeHaven as his expert witness. She was a licensed marriage and family therapist with a master's degree. She had never testified as an expert before. She was familiar with research regarding infant attachment and attachment disorder. However, she had not done any clinical work regarding infant attachment, and she had not studied any children with attachment disorder. She had worked with young adults who had been in disrupted adoptions. She had seen children who had been separated from their psychological parents "maybe just a couple [of] times."

In DeHaven's opinion, a child who had already formed an attachment with one caregiver probably would not suffer from attachment disorder if transferred to a different caregiver. "[T]he child will be able to form new attachments." "[T]here's going to be a little bit of distress . . . . [I]f the child is emotionally healthy and attached and going into a warm and nurturing environment, . . . the distress would probably be minor at best and short-term." "Obviously if there was some untoward event that occurred, some major trauma that occurred, some significant change in circumstance that occurred, of course, it's possible, but generally speaking, a child who has securely attached is not necessarily a candidate for attachment disorder."

The D.'s introduced evidence intended to show that Jaime (1) had had a criminal sexual relationship with a then 13-year-old girl, (2) was affiliated with a gang, (3) was an alien who was likely to be deported, (4) used alcohol and marijuana regularly, (5) had abused Annie, and (6) had had only three visits with Daniele, during which he did not interact well with her. Jaime presented contrary evidence. The trial court found the D.'s evidence unpersuasive: "To the extent they have attempted to show Jaime's unfitness as a basis for their contention of detriment, [the D.'s] have failed to sustain their burden of proof." The D.'s do not challenge this finding.

2. *The Trial Court's Ruling.*

On April 10, 2000, the trial court denied the D.'s guardianship petition. In a careful and detailed written ruling, it explained:

"[The D.'s] bear the burden of proving by clear and convincing evidence that an award of custody to a parent would be detrimental to the child and that placement with the proposed guardians is in the best interest of the child." [¶] . . . [¶]

"Dr. Fineman's testimony establishes, and the court finds by clear and convincing evidence, that removing Daniele from the custody of [the D.'s] would be significantly detrimental to her. [¶] . . . [¶]

"[The D.'s] contend that <u>Zachary H.</u>[5] states the controlling law. If they are correct, their petition should be granted, regardless of the nature, extent and timeliness of Jaime's efforts to obtain custody.

"<u>Zachary H.</u> is similar on its facts to the present case in several important respects. The court did not find the father to be unfit, nor did it fault the father for the delay in arriving at a final judgment, during which time attachment occurred. The sole reason for the conclusion that removal of the child would be detrimental [was] harm stemming from 'removal from a stable placement.' [¶] . . . [¶]

"The issue squarely raised, and not addressed by the <u>Zachary</u> court (perhaps because of the duration of the placement), is whether the constitutional protection afforded the parental relationship of a non-custodial father with his child may always be defeated if the decision-making process consumes enough time so that the child forms an attachment to the prospective guardian, thus establishing a detriment if the child is removed.

"[The D.'s] correctly contend that Jaime is not a presumed father, but only a biological father, under California law. The <u>Kelsey S.</u> decision supports that contention, but holds further that constitutional standards require the rights of a biological father who passes the 'Kelsey test' to be equivalent to those of the mother and, by logical extension, those of a presumed father. Jaime has objected to adoption by [the D.'s], and the court has sustained his objection. [The D.'s] have not shown why he should now be treated differently from a presumed father, or whether, at this stage, the distinction between a presumed father and a biological father is meaningful at all.

"The court in <u>Kelsey S.</u> . . . framed the issue it decided as follows: [¶] [']Is the state's important interest in the well being of a child born out of wedlock substantially furthered by allowing the mother to deny the child's biological father an opportunity to form a relationship with the child that would give the father the same statutory rights as the mother (*or a presumed father*) in deciding whether the child will be adopted by third parties[?'] [Emphasis added.] [¶] The decision answers the question in the negative.

"It is true that the <u>Kelsey</u> court was deciding whether a biological father who passes the test has a right to prohibit an adoption of his child. The court expressly avoided deciding whether he had a right to custody. However, it would be strange indeed if, having vindicated his constitutionally protected right to 'an opportunity to form a relationship with the child,' he were ineluctably faced with the impossibility, through any efforts of his own, of

---

[5]*Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51 [86 Cal.Rptr.2d 7].

ever gaining physical custody or of sharing legal custody with the mother. [¶] . . . [¶]

"The courts are required to give great weight to the permanent and stable placement of a child. There are instances, however, in which that priority must be considered with others. Although there is ample room for improvement by the judiciary and the bar, it is certain that cases such as this one take time to prepare, try and decide. It is unacceptable to allow the time consumed by the process itself to dictate the result.

"Here, the preference for placement with a biological parent outweighs the detriment to the child." (Fns. omitted.)

B. *Analysis.*

In appointing a guardian of the person for a child, the trial court must follow Family Code sections 3020 et seq. and 3040 et seq., relating to child custody. (Prob. Code, § 1514, subd. (b).) The ordinary standard of decision in a custody matter is the best interest of the child. (Fam. Code, § 3040.) Under the parental preference doctrine, however, an award of custody to a nonparent as against a parent cannot be made based on the child's best interest alone; in addition, it "must be supported by an express finding that parental custody would be detrimental to the child and that finding must be supported by evidence showing that parental custody would actually harm the child." (*In re B.G.* (1974) 11 Cal.3d 679, 683 [114 Cal.Rptr. 444, 523 P.2d 244]; see also *id.*, at pp. 693-699.) The parental preference doctrine has been codified in Family Code section 3041, which provides that a court cannot award custody to a nonparent unless it finds "that granting custody to a parent would be detrimental to the child and that granting custody to the nonparent is required to serve the best interest of the child." (Fam. Code, § 3041.)[6]

Here, the trial court found that removing Daniele from the D.'s custody would be "significantly detrimental" to her. Although it did not

---

[6]In *Guardianship of Diana B.* (1994) 30 Cal.App.4th 1766 [36 Cal.Rptr.2d 447] (Fourth Dist., Div. Two), this court held that the necessary findings may be made based on the preponderance of the evidence. (*Id.*, at pp. 1773-1777.) Other courts have since disagreed and have held that proof by clear and convincing evidence is required. (*Guardianship of Jenna G.* (1998) 63 Cal.App.4th 387, 391-394 [74 Cal.Rptr.2d 47] (Fifth Dist.); *Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418, 1423-1432 [47 Cal.Rptr.2d 409] (First Dist., Div. Two).)

Here, the trial court applied the clear and convincing evidence standard; it found, by clear and convincing evidence, that an award of custody to either parent would be detrimental to Daniele. Accordingly, we are not called upon to decide whether it could have applied a lower standard of proof.

make an explicit separate finding regarding her best interest, it did find that, if *Guardianship of Zachary H.*, *supra*, 73 Cal.App.4th 51 were controlling, it would have to grant the guardianship petition. This necessarily implies a finding that leaving her in the D.'s custody was in her best interest. Indeed, the very finding of detriment also necessarily implies such a finding. (See *In re Zacharia D.* (1993) 6 Cal.4th 435, 455-456 [24 Cal.Rptr.2d 751, 862 P.2d 751] [finding of " 'substantial risk of detriment' " from return to father's custody indicated trial court would not have found return to father's custody was in child's " 'best interests' "].) Thus, under statute, it should have granted the D.'s guardianship petition. It declined to do so, however, based on *Kelsey S.* and "the constitutional protection afforded the parental relationship of a non-custodial father with his child . . . ." In essence, it ruled California's guardianship statutes unconstitutional as applied.

The trial court, to its credit, acknowledged that *Kelsey S.* itself did not decide whether or when a *Kelsey S.* father is entitled to custody. Rather, *Kelsey S.* stated: "[T]he sole question before us is whether petitioner has a right to withhold his consent to the adoption of his biological child. We decide no issue as to the custody of the child. . . . If . . . the trial court concludes that petitioner has a right to withhold consent, that decision will bear only on the question of whether the adoption will proceed. Even if petitioner has a right to withhold his consent (and chooses to prevent the adoption), there will remain the question of the child's custody. That question is not before us, and we express no view on it." (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 851.)

The trial court reasoned, however, "it would be strange indeed if, having vindicated his constitutionally protected right to 'an opportunity to form a relationship with the child,' [a biological father] were ineluctably faced with the impossibility, through any efforts of his own, of ever gaining . . . custody . . . ." (Fn. omitted.) We commend the trial court for its thoughtful effort to adhere to what it sincerely considered to be the dictates of *Kelsey S.* Nevertheless, we disagree, for five reasons.

First, this reasoning confuses a constitutionally protected interest with a constitutional right. An individual *can* be deprived of a constitutionally protected interest, provided he or she is accorded due process and equal protection. Thus, the *Kelsey S.* court identified a father's protected liberty interest, but it did not stop there. Rather, it stated: "In constitutional terms, the question is whether California's sex-based statutory distinction between biological mothers and fathers serves ' ". . . important governmental objectives and [is] *substantially related* to achievement of those objectives." ' [Citation.] Does the mother's ability to determine the father's rights substantially serve an important governmental interest? The question is the same

'whether the analysis [is] undertaken as a matter of due process or equal protection.' [Citation.]" (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 844, quoting *Caban v. Mohammed* (1979) 441 U.S. 380, 388 [99 S.Ct. 1760, 1766, 60 L.Ed.2d 297] and *Matter of Raquel Marie X.* (1990) 76 N.Y.2d 387, 403 [559 N.Y.S.2d 855, 559 N.E.2d 418, 425].)

California's guardianship and custody statutes—unlike its adoption statutes—contain no sex-based distinctions. They do not distinguish between mothers and presumed fathers on the one hand and "mere" biological fathers on the other. *All* parents are entitled to custody, as against *all* nonparents, unless the trial court finds that parental custody would be detrimental and that nonparental custody is in the best interest of the child.

Ordinarily, the necessary finding of detriment may be based on the harm the child would suffer from being separated from a nonparent caregiver. (*Guardianship of Olivia J.* (2000) 84 Cal.App.4th 1146, 1158-1161 [101 Cal.Rptr.2d 364]; *In re Brittany H.* (1988) 198 Cal.App.3d 533, 551-552 [243 Cal.Rptr. 763]; *In re B. J. B.* (1986) 185 Cal.App.3d 1201, 1208-1209 [230 Cal.Rptr. 332]; *In re Volkland* (1977) 74 Cal.App.3d 674, 679-680 [141 Cal.Rptr. 625]; *Guardianship of Marino* (1973) 30 Cal.App.3d 952, 954-956, 961 [106 Cal.Rptr. 655].)[7] The trial court ruled, however, that this is *not* the case where a nonparent is seeking custody as against a *Kelsey S.* father; in that event, it ruled, any detriment must be balanced against "the preference for placement with a biological parent." Thus, the trial court accorded a *Kelsey S.* father *greater* rights than either a mother or a presumed father.

Second, the trial court failed to consider the countervailing fundamental interests of Daniele and of the state. "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be

---

[7]Several cases have held that, in the juvenile dependency context, a finding that returning a child to his or her parents' custody would create a substantial risk of detriment (see Welf. & Inst. Code, §§ 366.21, subds. (e), (f), 366.22, subd. (a)) cannot be based solely on the child's attachment to prospective adoptive parents. (*In re Rodrigo S.* (1990) 225 Cal.App.3d 1179, 1184-1185 [276 Cal.Rptr. 183]; *In re Venita L.* (1987) 191 Cal.App.3d 1229, 1240-1241 [236 Cal.Rptr. 859].) They reason that "[i]f a child's immediate bonding or attachment to foster parents could outweigh all other considerations, then reunification services, especially in the case of a very young child . . . , would serve no meaningful purpose." (*In re Venita L.*, *supra*, at p. 1240.)

In the guardianship context, however, this concern does not apply. Moreover, in *In re Jasmon O.* (1994) 8 Cal.4th 398 [33 Cal.Rptr.2d 85, 878 P.2d 1297], the Supreme Court agreed that a finding of a substantial risk of detriment could not be based solely on "a successful relationship between a foster child and foster parent," but could be based on evidence that "the severing of the bond with the foster parents would do serious, long-term emotional damage" to the child. (*Id.*, at p. 418.) It expressly disapproved *Venita L.* to the extent that it was inconsistent with this holding. (*In re Jasmon O.*, *supra*, at p. 421, fn. 3.) In the present case, the evidence showed a strong likelihood of "serious, long-term emotional damage."

interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826].)

"The child has a 'liberty interest[]' [citation] in a 'normal family home' [citation], with his parents if possible [citation], or at least in a home that is 'stable' [citation]. This concern has been characterized as 'important' [citation] and even 'compelling' [citation]. 'It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or [other caretakers]. . . .' [Citation.]" (*In re Sade C.* (1996) 13 Cal.4th 952, 988 [55 Cal.Rptr.2d 771, 920 P.2d 716], cert. den. *sub nom. Gregory C. v. Los Angeles County Dep't of Children's Servs.* (1997) 519 U.S. 1081 [117 S.Ct. 747, 136 L.Ed.2d 685], quoting *Santosky v. Kramer* (1982) 455 U.S. 745, 754, fn. 7, 759 [102 S.Ct. 1388, 1395, 1397-1398, 71 L.Ed.2d 599], *In re Marilyn H., supra,* 5 Cal.4th at p. 306, and *Lehman v. Lycoming County Children's Services* (1982) 458 U.S. 502, 513-514 [102 S.Ct. 3231, 3238-3239, 73 L.Ed.2d 928].)

*Kelsey S.* recognized that the state has "an important and valid interest" in the well-being of children. (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 844.) It explained, however, that allowing only biological mothers, and not biological fathers, to determine whether their children could be adopted was not substantially related to this interest. (*Id.,* at pp. 844-848.) By contrast, denying custody to biological fathers (and mothers), once it has been proven that such custody would be detrimental to their children, *is* directly and substantially related to this interest. "Cases which hold that deference is to be accorded to *parental* rights do so in part on the assumption that children's needs generally are best met by helping parents achieve their interests. [Citations.] In some situations, however, children's and parents' rights conflict, and in these situations, the legal system traditionally protects the child. [Citations.]" (*In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1504 [49 Cal.Rptr.2d 507], cert. den. *sub nom. Cindy R. v. James R.* (1997) 519 U.S. 1060 [117 S.Ct. 693, 136 L.Ed.2d 616].)

Third, *Kelsey S.* itself implicitly indicated that it would be constitutional to apply the detriment standard to a *Kelsey S.* father. The court noted that, in *In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918], it had held that in a proceeding to terminate a natural father's parental rights, the general custody statute—including the detriment standard—applied; thus, a natural father's parental rights could not be terminated absent a finding that his custody would be detrimental to the child. (*Adoption of Kelsey S., supra,* 1 Cal.4th at pp. 839-840, citing *In re Baby Girl M., supra,*

at p. 69.) Thereafter, the Legislature had amended the applicable statutes to provide that, in a proceeding to terminate a natural father's parental rights, the general custody statute did not apply. (*Adoption of Kelsey S.*, *supra*, at pp. 840-841.) The Supreme Court stated: "[I]n light of the Legislature's prompt and unequivocal amendment . . . to supersede our decision in *Baby Girl M.*, . . . we cannot conclude that the Legislature intended to preserve the detriment standard. To the contrary, it is clear that the Legislature meant to provide natural fathers with far less rights than both mothers and presumed fathers have under California's statutory system. The question is whether that distinction is constitutionally tenable." (*Id.*, at p. 844.) The court went on to hold that it was not. (*Id.*, at pp. 844-850.) We read this to mean it *would* be constitutional to apply the detriment standard to natural fathers *as well as* to mothers and presumed fathers.

Much the same principle is also apparent from *Baby Girl M.* There, as already noted, the Supreme Court held that a natural father had been erroneously denied custody without a finding of detriment. (*In re Baby Girl M.*, *supra*, 37 Cal.3d at pp. 68-73.) It recognized that an unwed father's constitutional " 'opportunity interest' " required " 'commitment to and exercise of custodial responsibility' " and could be lost if he "voluntarily ignored [his] rights" or "failed to pursue possibilities available to [him]." It indicated, however, the natural father before it had maintained his opportunity interest. (*Id.*, at pp. 73-75.) Thus, it indicated he was what we would now call a *Kelsey S.* father.

The court, however, went on to state: "A review of the evidence introduced at the hearing indicates a finding of detriment would have been unsupportable *at that time*. However, concerned, as we must be, with the child's welfare and because of the passage of time, we recognize further evidence will be necessary. The circumstances leading to the earlier determination should be reviewed in light of subsequent events." (*In re Baby Girl M.*, *supra*, 37 Cal.3d at pp. 75-76, fn. omitted.) In a footnote, it added: "We recognize the dilemma arising under the present fact situation. The state has placed the child with prospective adoptive parents pending resolution of [the natural father]'s claims; strong relationships have developed, and breaking those bonds could be harmful to the child." (*Id.*, at p. 76, fn. 12.) The Supreme Court thus at least strongly suggested that the necessary finding of detriment could be based on the child's attachment to a nonparent caregiver while custody litigation was pending.

Fourth, the trial court assumed that the detriment shown in this case, as a matter of fact, would "ineluctably" be shown in every case. But a child will not necessarily become bonded to a nonparent caregiver in the time it takes

a *Kelsey S.* father to obtain a hearing on custody. Here, the expert testimony was in conflict. Dr. Fineman testified that, "barring [a] miracle," a child taken from its primary caregiver at the age of seven months will develop attachment disorder. DeHaven testified to the contrary. The trial court believed Dr. Fineman. However, we cannot say, as a matter of law, that a court must always find detriment in this situation.

As Jaime points out, in *Guardianship of Stephen G., supra*, 40 Cal.App.4th 1418, a mother placed her son with his grandmother for seven years; when she tried to retake custody, the grandmother filed a guardianship petition. (*Id.*, at p. 1421.) Even though a psychologist testified that it would be detrimental to take the boy from the grandmother because he had "a 'psychological parent-child bond' " with her (*ibid.*), the trial court ruled that the grandmother had failed to make a sufficient showing of either detriment or best interest. (*Id.*, at p. 1422.) The appellate court upheld this finding. (*Id.*, at p. 1432.)

There are several things a *Kelsey S.* father can do to prevent his child from becoming attached to a nonparent. Here, Jaime knew Annie planned to place her baby for adoption. He could have filed an OSC regarding custody even before Daniele was born; thus, he could have prevented Daniele from being placed with the D.'s. Even after he did file a custody OSC, he did not seek temporary custody ex parte (except once, in the Riverside court, which denied it because the Los Angeles court still had jurisdiction). The trial court repeatedly denied temporary visitation; Jaime does not contend this was error. Finally, it would seem that Jaime could have obtained an earlier hearing on his custody OSC. As we held in an unpublished portion of this opinion, despite these delays on Jaime's part, the trial court could reasonably find that he was a *Kelsey S.* father. Once evidence of the resulting attachment between Daniele and the D.'s was before it, however, it could also find detriment.

We recognize that, as a matter of substantive due process, the parental rights of a *Kelsey S.* father cannot be terminated without a finding that he is unfit. (*Adoption of Kelsey S., supra*, 1 Cal.4th at pp. 830-834, 849.) A guardianship, however, does not require the termination of either parent's rights. To the contrary, the guardianship itself may be terminated at any time, based on a showing that termination of the guardianship is in the child's best interest. (Prob. Code, § 1601.)

Fifth, the trial court disregarded the relevance of *Guardianship of Zachary H., supra*, 73 Cal.App.4th 51. There, an unwed father filed a paternity petition before the child was born. The mother placed the child with prospective adoptive parents, who filed an adoption petition and a petition to

terminate the father's parental rights. The trial court terminated the father's parental rights. (*Id.*, at p. 53.)

In an earlier appeal, however, this finding had been reversed, and the case had been remanded for reconsideration of the father's *Kelsey S.* status. (*Guardianship of Zachary H., supra,* 73 Cal.App.4th at pp. 54-57.) On remand, the trial court reinstated the father's parental rights. (*Id.*, at p. 57.) The former adoptive parents then filed a guardianship petition. (*Ibid.*) The trial court, finding that the child would suffer detriment if he were removed from the custody of the former adoptive parents, granted the petition. (*Id.*, at pp. 57-60.)

The father appealed. (*Guardianship of Zachary H., supra,* 73 Cal.App.4th at p. 53.) He argued that *Kelsey S.* and other cases required a showing that he was unfit before the guardianship petition could be granted. The appellate court disagreed: "[T]he cited cases stand for the proposition that federal due process principles safeguard termination of parental rights in the absence of a showing of unfitness. This case does not involve termination of parental rights. It simply involves custody after a failed adoption." (*Id.*, at p. 62.)

The father also argued that the evidence that the child was attached to the adoptive parents was insufficient to support a finding of detriment. (*Guardianship of Zachary H., supra,* 73 Cal.App.4th at p. 65.) Once again, the court disagreed. It stated: "[D]etriment has no clear-cut meaning and the courts must have flexibility to make fact-specific decisions in cases like this one." (*Id.*, at p. 66.) It concluded that "the harm from being removed from a stable placement can support the detriment prong of Family Code section 3041." (*Ibid.*)

Here, the trial court conceded that, if *Zachary H.* was controlling, the D.'s guardianship petition should be granted. It also conceded that, in *Zachary H.*, "[t]he court did not . . . fault the father for the delay in arriving at a final judgment, during which time attachment occurred. The sole reason for the conclusion that removal of the child would be detrimental [was] harm stemming from 'removal from a stable placement.' " It concluded, however, that *Zachary H.* did not address "whether the constitutional protection afforded the parental relationship of a non-custodial father with his child may always be defeated if the decision-making process consumes enough time so that the child forms an attachment to the prospective guardian, thus establishing a detriment if the child is removed."

It is true that, in *Zachary H.*, partly because the case had already been up on appeal, the child had been with his prospective guardians nearly three

years by the time of trial. (*Guardianship of Zachary H., supra,* 73 Cal.App.4th at p. 57.) Nevertheless, *Zachary H.* necessarily means that a nonparent *can* prevail over a *Kelsey S.* father in a guardianship proceeding "if the decision-making process consumes enough time so that the child forms an attachment to the prospective guardian . . . ."

Jaime argues that the father in *Zachary H.* was responsible for some of the litigation delay. In the earlier appeal, however, the appellate court had noted that the father's " 'lapses once he became involved in court proceedings' " *could* have supported a finding that he was not a *Kelsey S.* father; it had remanded so the trial court could reconsider whether the father had " ' "done all that he could reasonably do *under the circumstances.*" ' " (*Guardianship of Zachary H., supra,* 73 Cal.App.4th at p. 56.) On remand, the trial court essentially found he was a *Kelsey S.* father. The appellate court never questioned this finding. Thus, it accepted that his litigation delay was reasonable.

For all these reasons, we conclude the trial court erred. We hold that the guardianship petition should have been adjudicated according to the usual "detriment" and "best interest" standard set forth in Family Code section 3041. Thus, once the trial court found that granting custody to a parent would be detrimental, and that granting custody to the D.'s would be in Daniele's best interest, it should have granted the petition.

## V

### DISPOSITION

The order requiring Jaime's consent to adoption is affirmed. The order denying the D.'s guardianship petition is reversed. The matter is remanded to the trial court with directions to grant the D.'s guardianship petition forthwith.

Hollenhorst, Acting P. J., and Gaut, J., concurred.