Filed 7/11/14  Adoption of B.K. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Adoption of B.K., a Minor. | |
| M.K. et al., | |
| Plaintiffs and Respondents, | G049223 |
| v. | (Super. Ct. No. AD79106) |
| BRANDON G., | O P I N I O N |
| Defendant and Appellant; | |

Appeal from a judgment of the Superior Court of Orange County, Ronald P. Kreber, Judge.  Affirmed.

Suanne I. Honey for Defendant and Appellant.

Leslie A. Berry and Ted R. Youmans for Plaintiffs and Respondents M.K. and L.K.

Marsha F. Levine, under appointment by the Court of Appeal, for Plaintiff and Respondent Brianna D.

\*　　　\*　　　\*

Brandon G. appeals from a judgment terminating his parental rights after the birth mother, Brianna D., consented to adoption of the couple's newborn daughter, B.K., by M.K. and L.K.[1]  (Fam. Code, § 7662; all statutory references are to the Family Code unless noted.)  Brandon challenges the sufficiency of the evidence to support the trial court's decision.  Because substantial evidence supports the trial court's judgment Brandon was not a presumed father, and his consent to the adoption was not required (Fam. Code, § 7611, subd. (d); *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*); *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051 (*Michael H.*)), we affirm.

I

FACTS AND PROCEDURAL HISTORY

Brianna met Brandon in 2009, during her freshman year of high school.  He was two grades ahead of her.  They began dating in late 2011 and became sexually intimate shortly thereafter.  According to Brianna, they had several discussions about getting married and starting a family together.  Brandon seemed to favor the idea, and the couple discussed how they would support a baby.

On February 15, 2012, they decided to stop using contraceptives so Brianna could get pregnant.  Brandon testified he and Brianna did not plan a pregnancy, but conceded they had a "mature conversation" before Brianna stopped taking birth control and he was okay with having a child.  In late March, Brianna learned she was pregnant and shared the news with Brandon, who seemed disappointed when she told him.  When

---

[1]　　　We identify the parties and witnesses by their given names and last initials to protect the identity of the minor child.

2

Brianna asked him how they were going to raise the baby, he said "we'll deal with it when it comes."

Brandon told no one about the pregnancy. He expressed fear of being arrested for unlawful sexual intercourse. On one occasion, when someone asked Brianna if she was pregnant, Brandon said "'[s]ee, this is why I can't take you out.'"

In April 2012, the day after Brianna's 18th birthday, she moved in with Brandon's family. Brandon's mother, Heather, also expressed concern Brandon could be arrested for "statutory rape." She asked Brianna not to tell Brianna's mother, Kim E., about the pregnancy, and not to obtain prenatal care until she was off her parents' medical insurance. Heather later advised her to tell Kim the due date was in January, or nine months after Brianna's 18th birthday. Heather told her Brandon was on a 90-day probation period for his new job at Ashford University and would be fired if any charges were brought. Heather advised Brianna she could live with their family rent free. Brianna later found out Brandon may have paid Heather $300 a month in rent for Brianna and himself, but Brianna only saw Brandon pay rent once.

The couple's relationship began souring in August 2012. Brianna felt Brandon emotionally cheated on her with his friend, Laura, who he would constantly text and see often.[2] Their alienation culminated at the couple's baby shower in late August. One of Brianna's friends testified Brandon did not open any gifts, nor did Brandon invite any of his friends other than Laura. Brandon claims he invited no one else because Brianna extended an open invitation on Facebook and he assumed his friends would come. According to Brianna, he left the party and was absent a long time. After the baby shower, Brianna suggested counseling, but Brandon refused.

Brianna felt Brandon did not support her emotionally. When Brandon came home from work, he locked himself in his bathroom for hours at a time so he could

---

[2] Laura testified she and Brandon were close friends, but never romantically involved. They saw each other about once a month.

3

be alone. He spent time with his friends, but would not let Brianna accompany him, leaving her alone at his house. Brandon admitted he did not attend Brianna's first obstetrical appointment, and when Brianna texted him after the appointment telling him their baby had a heartbeat, he responded dismissively, "'Later babe.'"

Brianna also complained Brandon did not financially support her or their unborn child, but rather spent money on leisure goods. She was not allowed to bring her own car to the G.'s, and Brandon refused to insure her on his vehicle. He declined to pay for prenatal or pregnancy expenses, leaving Brianna to pay $750 for these costs. Brandon bought neither medical insurance for the baby nor maternity clothes for Brianna. During Brianna's pregnancy, however, Brandon admittedly spent several hundred dollars on videogames, and $500 on an iPhone. He also ate out for lunch several times a week even though Brianna made him a lunch every day. The only baby-related item that Brandon purchased while Brianna lived with him was a pack of diapers.

Brandon testified he took care of Brianna's financial needs. When he first learned of the pregnancy, he was making $8.50 an hour working at a tuxedo store. He immediately obtained better employment at Ashford University making $18.75 an hour. He paid rent to his mother from May through September in cash, but admitted he had no record in his checking account to show he made those payments. In July, he and Brianna found an apartment, but decided to wait until the rent went down. They discussed purchasing a car for Brianna and agreed he would purchase Heather's car if they did not have a family car by the time the baby was born. They also discussed acquiring car insurance for Brianna, but felt it would be a waste of money because Brandon's grandfather was available to drive her. Brandon also stated he bought things for the baby, but these purchases occurred in December, after litigation had begun.

As a result of their bickering, Heather made Brandon and Brianna sign an agreement designating their household obligations. The agreement did not impose any formal chores on Brianna, but she frequently helped out around the house.

4

Brandon often disparaged Brianna's mother, Kim, once revealing that if forced to sit next to her he would want to slap her. On September 24, Brianna read Brandon's text message that said he wanted Brianna's family to "'die in a fiery plane crash.'" Brianna shoved Brandon, packed her bags, and left the G.'s. Brandon was laid off from his university job later that day and did not tell Brianna, who moved back in with Kim after September 24. Brianna paid her for rent and pregnancy-related items, such as pain medicine and a breast pump.

After Brianna moved out, she and Brandon met four times to discuss their daughter's future. At the first meeting they discussed the possibility Brandon's grandparents, Chuck and Terrie T., would raise the child along with Heather, but Brianna rejected the idea. At the second meeting they discussed adoption for the first time. Brianna felt adoption was best because she grew up in a home with divorced parents and did not want to impose that on her daughter. Brandon said "'[u]ltimately, it's up to you,'" but later sent mixed messages about his willingness to put the child up for adoption.

After their second meeting, on October 23, 2012, three days before B.K. was born, Brandon sent a note to Brianna's obstetrician objecting to the adoption. When Brianna advised Brandon of B.K.'s birth, he responded with a text message stating "'[s]o you mean she's been adopted against my will.'" Brandon never requested to be present for his child's birth.

M.K., the prospective adoptive father, testified Brandon did not reach out to his wife or him before the baby's birth, and not until after Brandon filed his lawsuit. He also sent the K.'s several checks after the litigation commenced.

Brandon filed a petition to establish a parental relationship in October 2012 and served it on Brianna a week later. B.K. was born later in October 2012. She went home from the hospital with M.K. and L.K. It is conceded Brandon had no idea of the expenses involved in his daughter's birth.

5

Brianna's adoption coordinator, Sarah J., met with Brandon on November 15, 2012. She testified Brandon did not seem against the adoption, but rather was angry he missed his daughter's birth. Sarah told Brandon the K.'s had offered to let him meet the baby, but he refused.

In November 2012, Brianna and the K.'s jointly filed a request to adopt B.K., and a petition to determine Brandon's parental rights and the necessity of his consent to adoption. (§§ 7662, 7664.) Following a court trial in July 2013, the court terminated Brandon's parental rights after it determined his consent was not required for the adoption.

## II

### DISCUSSION

Brandon contends he qualifies as a statutory presumed father under section 7611, subdivision (d) (§ 7611(d)), because Brianna lived with him during a portion of her pregnancy. He also argues he qualifies as a quasi-presumed father because he made a full commitment to his parental responsibilities by welcoming Brianna into his home while she was pregnant, giving her a baby shower, and transporting her to school.

A biological father's parental rights often turn on whether he attains the status of a presumed father. (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 718; *Kelsey S., supra,* 1 Cal.4th at p. 823.) "Under California law, an unwed biological father has a right to withhold consent to the adoption of a child only if he meets the definition of a 'presumed father.'" (*Adoption of A.S.* (2012) 212 Cal.App.4th 188, 202 (*A.S.*).) "'If a man is the presumed father of a child, the child cannot be adopted without his consent [citation], unless the trial court finds, on statutorily specified grounds, that he is unfit. [Citation.] If, however, he is not a presumed father of a child, the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]'"

6

(*Adoption of H.R.* (2012) 205 Cal.App.4th 455, 465; *Adoption of Daniele G.* (2001) 87 Cal.App.4th 1392, 1394-1395.)

"Section 7611 sets forth the ways in which a man can attain the status of presumed father: 'A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with Section 7540 [(presumption arising from birth of child during marriage)] ) or Chapter 3 (commencing with Section 7570 [(voluntary declaration of paternity)]) . . .' or in specified other circumstances including marriage or attempted marriage to the mother under certain conditions, and having 'receive[d] the child into his home and openly [held] out the child as his natural child.'" (*A.S., supra,* 212 Cal.App.4th at p. 202.)

Here, Brianna and the K.'s filed a petition to determine Brandon's parental rights pursuant to section 7662. Section 7662 generally provides that if a mother relinquishes or consents to the adoption of her child, she or the prospective adoptive parent must file a petition to terminate the parental rights of the alleged father, absent certain circumstances not present in this case. Other proceedings affecting a child (see, e.g., § 3000 et seq. [concerning child custody]; § 3500 [child support]; § 7500-7730 [addressing rights of parents, and presumptions of paternity, blood tests to determine paternity, and establishment of paternity by voluntary declaration]) are stayed pending final determination of proceedings to terminate the parental rights of the alleged father.

A.    *Substantial Evidence Establishes Brandon is Not a Statutorily Presumed Father*

Brandon first contends he openly received the child into his home and openly held out the child as his natural child. He argues "bringing the Mother into [the father's] home and holding the child out as his own in utero" qualifies him as a presumed father under § 7611(d). We disagree. To become a presumed parent under section § 7611(d), the parent must actually receive *the child* into his home. (*Kelsey S., supra,* 1 Cal.4th at pp. 826, 830, 847; see *Michael H.*, *supra*, 10 Cal.4th at p. 1051 [man must "*physically* bring the child into his home"].)

7

Here, Brandon never received B.K. into his home because the K's took physical custody of B.K. immediately after her birth. Brandon could not attain the status of a statutorily presumed father under section § 7611(d), simply by living with Brianna during her pregnancy.[3] Brandon therefore does not qualify as a statutorily presumed father. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1221-1232 [mother lived with biological father during pregnancy but was no longer living with him when baby born; court held father did not receive child into his home].)

B.    *Substantial Evidence Establishes Brandon is Not a Presumed Father Under Kelsey S. and Its Progeny*

Brandon next challenges the trial court's conclusion that he was not a presumed father under *Kelsey S., supra,* 1 Cal.4th 816. *Kelsey S.* "established that a natural father who does not have a right to block a third party adoption as a presumed father under section 7611 may nevertheless have a constitutional right to do so. [Citations.] In *Kelsey S.,* the unwed mother sought to place the child for adoption; the natural father sought custody of the child but was prevented from achieving the status of presumed father under the provisions of what is now section 7611, subdivision (d), because he was prevented from receiving the child into his home. [Citation.] The court held that the statutory scheme 'violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest.' [Citation.]" (*A.S.*, *supra*, 212 Cal.App.4th at p. 208.)

*Kelsey S.* "held that "'[a] father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible

_____

[3]    We assume for present purposes the home where Brandon lived with his family qualified as his home under § 7611(d).

8

relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship.'" [Citations.] 'If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities – emotional, financial, and otherwise – his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother.' (Citation.)" (*A.S.*, *supra*, 212 Cal.App.4th at pp. 208-209.)

*Kelsey S.* focuses on the natural father's commitment to his *parental* responsibilities rather than his emotional support of the mother. Nothing in *Kelsey S.* suggests a father is required to love the mother, or to propose marriage to qualify as a fully-committed parent. *Michael H.* is not to the contrary. The court there agreed with the adoptive parents a "mother may well need *emotional*, financial, medical, or other assistance during pregnancy, particularly if she . . . is a teenager," but this was because "prenatal care is critically important to both the mother and the child." (*Michael H.*, *supra*, 10 Cal.4th at p. 1055, italics added.)

In determining whether the biological father has demonstrated an unequivocal commitment to his parental responsibilities, [t]he father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate "a willingness himself to assume full custody of the child – not merely to block adoption by others." [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and

9

birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child.' (Citation.)" (*A.S.*, *supra*, 212 Cal.App.4th at p. 209; *Kelsey S., supra,* 1 Cal.4th at p. 849.) The biological father bears the burden to establish the factual predicate for his rights. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679-680.) "We review the trial court's decision under the substantial evidence test, viewing 'all factual matters most favorably to the prevailing party and in support of the judgment, indulging all reasonable inferences and resolving all conflicts accordingly.' [Citations.]" (*A.S., supra*, at p. 209.) "We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the" court's order and affirm the order even if there is other evidence supporting a contrary finding. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

　　　　*Michael H., supra,* 10 Cal.4th at p. 1060, "clarified that the constitutional protection of *Kelsey S.* requires evidence that a natural father '*promptly* came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a *short time* after he learned or reasonably should have learned that the biological mother was pregnant with his child.' (Italics added.) There, the father learned of the pregnancy in July and beginning in November made 'impressive' efforts to assume his parental role, including seeking legal advice, contacting the media, requesting assistance from local political figures, researching the law himself, filing a custody petition in Arizona (where he and the mother lived when they were together and the baby was conceived) before the child was born. [Citation.] In early March, he found an attorney who would take his case free, the attorney immediately contacted the prospective adoptive parents and learned the baby had been born a bit more than a week before, and the father immediately asked for custody, sent out birth announcements and bought baby clothes and equipment. [Citation.] However, in the early months of the pregnancy, the father had first suggested

10

abortion, then agreed to adoption and researched agencies with the mother, and until the date he learned from his attorney that the baby had been born, the father continued to speak with the mother and the prospective adoptive parents she had committed to as though he still agreed with the adoption plan. [Citation.]" (*A.S.*, *supra*, 212 Cal.App.4th at p. 214.) *Michael H.* found the biological father's efforts insufficient to trigger his *Kelsey S.* rights. (*Ibid.*; see Kirkland, et al., Cal. Family Law Practice & Procedure (2013) ch. 5, § 171.24 [noting that although *Michael H.* purported to "'clarify'" *Kelsey S.*, it represents a significant retreat from *Kelsey S.* by stressing the difficulty father's ambivalence causes for adoption planning, and while the constitutional standard of *Kelsey S.* remains, the bar now has been placed so high that few fathers will ever clear it].)

*Kelsey S.*, as explained in *Michael H.*, requires an early, unwavering, and full commitment by father concerning his nascent parental responsibilities. "'The unwed father's protected interest requires both a biological connection and full parental responsibility; he must both be a father and behave like one. (Citations.)'" (*A.S.*, *supra*, 212 Cal.App.4th at p. 205.)

Here, substantial evidence supports the trial court's conclusion Brandon fell short of the *Kelsey S.* standard. As the trial court noted, the evidence demonstrated "Brandon had two screens to look at. One was the video games and the other was the child. And I always thought he – from the evidence, he pushed the wrong key and used the video games." Although Brandon may have initially favored the idea of a life with Brianna and their child, his relationship with Brianna deteriorated not long after she became pregnant and moved in with his family. The significant facts in this case that demonstrate Brandon did not fully commit to fathering B.K. include: (1) Brandon initially appeared despondent about the pregnancy and attempted to conceal the pregnancy from others because he feared criminal prosecution for unlawful sexual intercourse with a minor; (2) he failed to tell friends and others outside the family about

11

the pregnancy; (3) he failed to provide more than token financial support of Brianna and their unborn child nor plan for the child's future, and failed to pay for prenatal or pregnancy expenses, baby items or maternity clothes, and did not arrange medical insurance for the baby, but freely spent money on leisure items; (4) he failed to engage emotionally with the idea of fatherhood, illustrated by his actions at the baby shower (inviting no one, disappearing for a long stretch, declining to open any gifts), his sporadic attendance at obstetrical appointments and dismissive "later babe" response to Brianna's text about the baby's heartbeat; (5) after Brianna moved out, Brandon discussed the possibility that his grandparents would raise the child along with Heather, he discussed adoption, and he told Brianna it was "up to" her to make the decision; and (6) he failed to request to be present for his child's birth or to meet with the adoptive parents. (See *In re Ariel H.* (1999) 73 Cal.App.4th 70 [biological father continued to spend time with his friends after he learned that his girlfriend was pregnant, spent his money on compact discs instead of using it to help defray pregnancy costs, and never sought to visit his child].)

Arguably the most significant of the above facts is that Brandon led Brianna to believe adoption was an option after she moved out. Brianna testified she mentioned to Brandon on several occasions she was planning to place the baby for adoption and Brandon did not object. He did not stay in contact with her for approximately three weeks before the birth and did not come to the hospital, which supported her belief he agreed to the adoption. As *Michael H.* noted, If an unwed father is permitted to ignore his parental role during pregnancy but claim it after birth, it will often be very difficult to know with certainty whether he will be able to successfully contest an adoption until after the child is born. This uncertainty could well dissuade prospective adoptive parents from attempting to adopt the children of unwed mothers who . . . have chosen for whatever reason not to keep their child and raise it themselves. And that result would frustrate the state's clear interest in encouraging such adoptions

12

and providing stable homes for children. (Citations.) The state's interest in this matter is particularly important in light of the large number of children born to unwed parents . . . . (Citations.)" (*Michael H., supra*, 10 Cal.4th at p. 1056.) "[A]n adopted child may suffer emotional damage if the unwed father conceals his objection to a third party adoption during pregnancy and the adoptive parents take custody at birth in reliance on the unwed father's apparent consent, but the unwed father then initiates often lengthy legal proceedings after birth in an effort to derail the adoption and remove the child from the adoptive parents' custody. If such an unwed father is allowed to prevail after perhaps years of litigation, during which time the child will likely come to see the adoptive parents as his 'true' parents, the resulting disruption in familial relationships and living arrangements can have a very damaging impact on the child's psychological growth and development." (*Id.* at p. 1056-1057.)

Although Brandon presented evidence supporting his claim he committed to parenting B.K., we may not "revisit [the trial court's] determinations and refocus through [Brandon's] lens. . . . The question is whether the facts [viewed in a light most favorable to the judgment] measured up against the *Kelsey S.* and *Michael H.* standards and demonstrated a parental relationship entitled to protection under the federal Constitution. The court was required to determine whether [he] took prompt action towards assuming responsibility from the time he knew of the pregnancy. We find no error in the court's conclusion that [Brandon] fell short of the mark." (*Adoption of Arthur M.*, *supra*, 149 Cal.App.4th at p. 721.)

Finally, Brandon's complaint *Kelsey S.* and *Michael H.* set the bar too high for a biological father is misdirected. We are bound by precedent established by our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

The record viewed most favorably to the judgment reflects Brandon was ambivalent and not fully committed to the idea of fatherhood. The trial court did not err in terminating his parental rights and freeing B.K. for adoption.

13

## III

### DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.