[No. B172587. Second Dist., Div. Eight. Sept. 10, 2004.]

In re ANDREW L., a Person Coming Under the Juvenile Court Law.

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v.
ESMERALDA L., Defendant and Respondent;
ANTHONY L., Movant and Respondent;
STEVEN B. et al., Objectors and Appellants.

## COUNSEL

Law Offices of Barry Herzog, Barry Herzog; John L. Dodd & Associates, John L. Dodd and Ellen L. Bacon for Objectors and Appellants Steven B. and Carmine S.

Law Offices of Lisa Mandel, Anna Strasburg; Orren & Orren and Tyna Thall Orren for Objector and Appellant Andrew L.

Amir Pichvai for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

No appearance for Defendant and Respondent Esmeralda L.

Merrill Lee Toole, under appointment by the Court of Appeal, for Movant and Respondent Anthony L.

## OPINION

**COOPER, P. J.**—This is a juvenile dependency case in which the appellants are the minor, Andrew L., and his de facto parents, Carmine S. and Steven B.

Andrew, Carmine and Steven are appealing the juvenile court's orders which granted the petition for modification (Welf. & Inst. Code, § 388)[1] and request for reunification services of Anthony L., who is Andrew's biological father. Anthony has filed a responsive brief. The Los Angeles County Department of Children and Family Services (the Department) appears as respondent, siding with Anthony.

 There was substantial evidence to support the juvenile court's rulings that (1) Anthony did all he could reasonably do under the circumstances to

---

[1] All subsequent code citations are to the Welfare and Institutions Code unless otherwise indicated.

demonstrate his commitment to Andrew while the case was still at the family reunification phase, and (2) his due process rights were thwarted by the dilatory behavior of the Department's caseworker. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 825 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*); *In re Julia U.* (1998) 64 Cal.App.4th 532, 540–541 [74 Cal.Rptr.2d 920] (*Julia U.*).) Finding no abuse of discretion, we affirm.

## PROCEDURAL HISTORY AND FACTS

The juvenile court judge, Emily A. Stevens, was faced with conflicting evidence over whether Anthony had once visited Andrew earlier than he admitted knowing that the child existed.

A. *Proceedings and Reports Before Anthony Was Named As a Possible Father*

According to the juvenile dependency petition and detention report, Andrew's mother, Esmeralda L., has a history of drug abuse. When Andrew was born in May 2002, both he and Esmeralda tested positive for amphetamine. Andrew's six-year-old half brother, B., was already in foster care as a dependent child of the court. Andrew was immediately taken into protective custody and placed in the same foster home as B. Esmeralda told the Department's caseworker that Andrew's father was a man named Martin C. She did not know Martin's address or whereabouts, and said he wanted a paternity test.

At the May 8, 2002 detention hearing, Esmeralda again identified Martin as the father.

The Department's report for the May 30, 2002 jurisdiction hearing was written by caseworker Robert Davis. Esmeralda had told Davis that Martin wanted a DNA test because there was "a possibility" he was not Andrew's biological father.

Andrew was declared a dependent of the court at the May 30, 2002 proceedings. Family reunification services and suitable placement with B. were ordered. One month later, the court found due diligence as to Martin, whose whereabouts were unknown.

According to a January 21, 2003 report by Davis, Esmeralda still named Martin as the "alleged father" while saying that he might not be the biological father. The birth certificate did not specify a father, but gave Martin's last name to Andrew. Davis's report derived information regarding parental visits from reports by Laura Samuel-Norman, a foster agency

caseworker, which were attached to Davis's report. Later in the proceedings, attention focused on (1) a statement in Samuel-Norman's report of November 6, 2002, that Esmeralda and the "possible father" had visited Andrew on an unspecified date, and (2) a statement in Samuel-Norman's report of August 5, 2002, that Esmeralda and the "maternal grandmother" visited Andrew on August 3, 2002.

At the January 21, 2003 review hearing, Esmeralda complained that Davis, the Department's caseworker, had not been returning her calls. Judge Stevens verified from the dates in Davis's report that he had not attempted to contact Esmeralda in over six months. Finding that the Department had not provided Esmeralda with reasonable services, the judge refused to terminate family reunification services, and continued the proceedings to May 29, 2003.

## B. *Proceedings and Reports Once Anthony Appeared at Court*

Esmeralda and Anthony arrived at court together on May 29, 2003, requesting that Anthony receive DNA testing. Esmeralda told Judge Stevens that either Martin or Anthony might be Andrew's biological father.[2] Anthony said he first learned from Esmeralda "[a]bout probably two months ago" that

---

[2] In a different era, Shakespeare recognized the problem of determining paternity, in this passage from act I, scene II of The Tempest:
"MIRANDA: Sir, are not you my father?
"PROSPERO: Thy mother was a piece of virtue, and/She said thou wast my daughter . . . ."
A more modern version of the problem appeared in this discussion at the May 29, 2003 proceedings:
"THE COURT: And tell me your name again.
"THE ALLEGED FATHER: Anthony [L.]
"THE COURT: Who's Martin [C.]?
"THE MOTHER: That's my ex-boyfriend.
"THE COURT: Well, because the Department has the alleged father as Martin [C.]
"THE MOTHER: That's my ex-boyfriend, but he's not the dad.
"THE COURT: Why did you say he was the father?
"THE MOTHER: It was an accident.
"THE COURT: It was an accident?
"THE MOTHER: Yeah.
"THE COURT: I have to tell you that's pretty bizarre. What do you mean it was an accident?
"THE MOTHER: Well, because I had told him that he was the dad but like I was making—
"THE COURT: Are you saying you lied to him?
"THE MOTHER: No, I didn't lie to him. He has nothing to do with me no more. We don't talk.
"THE COURT: I really don't care whether you talk. The question is—
"THE MOTHER: We never really communicated when I was pregnant and through my pregnancy.
"THE COURT: Listen to me, Ma'am, I don't care who you communicated with. I just want to know who could be the father.
"THE MOTHER: He is.

he might be the father, and had talked to the worker "about three weeks ago." The court signed an order for DNA testing and ordered the Department to assist Anthony. Andrew and B. had been transferred to the foster home of Carmine and Steven as a potential adoptive placement. The Department requested a continuance, as caseworker Davis had just returned from medical leave, and no report was available. The court demanded a report for the next scheduled hearing, June 25, 2003.

According to Davis's report for the June 25, 2003 permanency hearing (§ 366.21, subd. (f)), Esmeralda was homeless, seven months pregnant, and still using drugs. She now said that Anthony rather than Martin might be Andrew's father. Anthony had not yet had the DNA test. He had a criminal record, which included a prison sentence in 1999 for second degree burglary and a parole violation in 2000 for receiving stolen property.

Attached to Davis's report was a February 6, 2003 foster agency report by Samuel-Norman, which indicated that the "alleged father visited once during the previous quarter but never called or visited again." Another attached document was a February 5, 2003 developmental evaluation by an organization called "TIES for Adoption." It included a statement by the former foster mother, Yolanda A., that Andrew's biological parents had visited him three months earlier (which would be November 2002), and the child looked like his biological father.

At the June 25, 2003 hearing, counsel was appointed for Anthony. He repeated his desire to take responsibility for Andrew if he was the father, and complained about a continuing lack of cooperation from Davis in providing the necessary paperwork for the DNA test. Andrew's counsel said she had twice spoken to Davis and had been unable to get him to act. Judge Stevens threatened to sanction the Department if the testing was not done by the end of the month. Since Esmeralda had not complied with the case plan, family reunification services were terminated. Anthony was instructed that, if testing showed he was the biological father, he could file a petition for modification under section 388.

The blood test results were available at a hearing on August 11, 2003. They proved that Anthony was Andrew's biological father. A contested hearing to terminate Esmeralda's parental rights as to B. (§ 366.26) was scheduled for September 11. Esmeralda and Anthony were told that parental rights to Andrew might be terminated at the section 366.26 hearing which was scheduled for him on October 7, 2003. Anthony requested visitation and full custody. Andrew's counsel opposed visitation because Anthony had "just

---

"THE COURT: Why did you say [Martin C.] was the father?
"THE MOTHER: At the time I had slept with both of them. That's why."

appeared," and 15-month-old Andrew was in a prospective adoptive home with B. Judge Stevens responded that it was the Department that had caused the delay. She ordered an evaluation of Anthony's home, told his counsel to quickly file a section 388 petition for modification, and denied visitation pending a decision on the petition.

C. *Proceedings on the Section 388 Petitions*

Anthony's first section 388 petition was filed on September 19, 2003. Based upon the new evidence of the paternity test, he requested reunification services, unmonitored visitation, a release of Andrew to him, and a finding that he was the presumed father.

In an attached letter to the petition, Anthony explained that in December 2002, he happened to see Esmeralda at a McDonald's restaurant. *He had not seen her and had had no way to contact her for one and one-half or almost two years.* She told him she had given birth to a son, and he might be the father. At his request, she telephoned him within a couple of days, and he saw Andrew. He then made repeated calls to the caseworker to try to arrange a DNA test. The caseworker failed to set up the test and stopped answering messages that were left on his machine. After two months, Anthony finally got the court date from a different social worker. He went to court and spoke to the judge, but still could not get cooperation from the caseworker. He told the judge about the problems on the next court date. One hour later, the social worker contacted him; four days later, the test was performed.[3]

Davis's report for the October 7, 2003 hearing recognized that the DNA test results proved that Anthony was Andrew's biological father. Esmeralda

---

[3] Anthony's letter stated in full: "In the month of December 2002, I was eating at McDonalds when Esmeralda, who I had no contact with for almost 2 yrs, approached me. She informed me that she had a son, and there was a possibility that I was his father. Esmeralda and I had no way of getting in contact with each other over the 1 1/2 yrs that passed, this is why she didn't tell me sooner. I gave her my phone number to call me so I could see her son. She called me within a couple of days, and I saw him. Esmeralda gave me the phone number to the social worker. I spoke with him, he told me he would set up a court date to take a DNA test, and call me back in a couple of weeks. He never returned my call, I left several messages on his machine, and still he did not return my calls. About two months passed. Then one day I called and spoke with a social worker who was sitting in for him. He gave me the court dates the baby had. So I went and spoke with the judge, he informed me of what I needed to get the DNA testing. Again I contacted the social worker and he said he would contact me in two weeks. Again he did not return my call. I went to his office and he wasn't there. I called several times. Then I spoke with his supervisors secretary and she said the supervisor would be able to help me, so I left my number with her. When I finally spoke with him he said there was nothing he could do, he could not help me. So I went to the babys next court date and told the judge the social worker was not returning my calls and all the effort I was making to get the DNA testing done. One hour after speaking to the judge, the social worker contacted me with the information to get the DNA testing done. Four days later I got the DNA test done."

had given birth to another baby boy in August and had continuing drug problems. Andrew had lived in the foster adoptive home of Carmine and Steven since March 20, 2003, was thriving there, and was bonded to Carmine and Steven and to his brother, B. The report described Carmine and Steven as two professionals in their mid-40's who have been in a committed relationship for over 13 years and live in a three-bedroom home. Davis recommended termination of the biological parents' parental rights and adoption as Andrew's permanent plan.

At the October 7, 2003 proceedings, Judge Stevens considered Anthony's section 388 petition before considering termination of parental rights. Anthony told the court that he wanted full custody. He was employed and currently supported two other children, ages seven and three, who lived with their mother. He picked them up on Saturday night and dropped them off on Sunday night. Anthony's mother, who was present, joined in his request, as did Esmeralda. Andrew and the Department opposed Anthony's petition.

After discussing the competing interests in detail, Judge Stevens found that Anthony was the biological father but not the presumed father. She denied the section 388 petition because it was not in Andrew's best interest to remove him from the adoptive home and the half brother with whom he had lived since birth. The section 366.26 proceedings were rescheduled for November 12, 2003.

Two days later, Judge Stevens brought the parties back to court, out of concerns with the fairness of her ruling. Double-checking dates, she noted that the hearing to determine a permanent plan for Andrew pursuant to section 366.21, subdivision (f) had occurred in May 2002. Andrew and B. were placed with the prospective adoptive parents on March 20, 2002. Andrew's counsel told the judge that Anthony had telephoned her on April 17 or April 19 to ask for the date of the next court hearing.

Judge Stevens believed that Anthony had been truthful, had no way to get in touch with Esmeralda for a long period of time, had attempted to establish paternity once he heard about Andrew, and had his efforts thwarted by the Department's inaction, while the case was still in the family reunification phase. Anthony was therefore instructed to file another section 388 petition, which would be considered before parental rights were terminated. The presence of the Department's caseworker was requested for the next hearing.

Anthony's second section 388 petition was filed on October 21, 2003. He alleged that the modification was in Andrew's best interest, because of his strong desire to integrate Andrew into his family and provide for his future needs. He requested reunification services, unmonitored visitation, a release of Andrew to him, and a declaration that he was the presumed father.

Further details were provided in a declaration from Anthony under penalty of perjury, which was attached to the second section 388 petition. He described the chance meeting with Esmeralda at a McDonald's restaurant in December 2002; seeing Andrew for the first time at a Burger King restaurant in the first week of January 2003; and making repeated unsuccessful efforts thereafter to get cooperation from the Department on paternity testing.[4]

---

[4] Anthony's declaration stated in full:

"1. My name is Anthony [L.] and I am the biological father of the minor Andrew [C.]

"2. My biological status was established through a DNA paternity test that I took at the Long Beach Genetics Laboratory that was ordered by the court and was shown in the test results dated Jul. 24, 2003.

"3. I have never been married to the mother and we never lived together but we dated for a period of approximately six weeks then we stopped seeing each other.

"4. In December, 2002 the mother and I had a chance meeting at a McDonalds. We had not seen each other in about two years and it was then that the mother told me that she had a son and there was a chance that I was the child's father.

"5. I asked if I could see the child and the mother told me about the child being under the supervision of the Department of Children and Family Services. She gave me the name and telephone number of the social worker Robert Davis.

"6. I asked about the next court date which the mother was unable to tell me but I arranged with the mother to see the child and I actually saw him around the first week of January 2003 when I joined the mother in a visitation at a Burger King in Pomona.

"7. The mother did not share with me why the matter was in the court system or what happened that she had lost temporary custody of the child but she assure me that she was going to get him back.

"8. I made my first in a series of many calls to the social worker Robert Davis after that January 2003 visit with the child. I left a message on the answer service of Mr. Davis to the effect that I had recently had a visit with the child and that I wanted to know what I could do to get a paternity test.

"9. After a week, having gotten no response to my first call, I called Mr. Davis again and left a similar message requesting a paternity test and I wanted to know the next court date and how I could participate in the proceedings.

"10. I continued to call the social worker again and again, usually on a Monday but I received no response to my calls. I left messages that were not answered, my calls went unreturned by anyone in the Department of Children and Family Services. I also called the attorney for the child and was told that she could not give me any information.

"11. Out of total frustration I went to the social worker's office in Covina around 10:30 [a.m.] to speak to him directly. I met with Mr. Davis and gave him my name[,] address and telephone number and I told him that I wanted a paternity test if that were possible.

"12. Mr. Davis told me that he would get back to me in a couple of weeks to let me know what I could do. I didn't hear from him for a couple of weeks so I called his office and left a message reminding him of our earlier meeting and our discussion.

"13. I went to the Covina office again and spoke to the receptionist who told me that Mr. Davis was on a two-month vacation so I asked to speak to Mr. Davis's supervisor but I was told that the regular supervisor was not in so I spoke to someone who was in charge who gave information regarding the next court date, where and the time.

"14. The first court date that I attended was in May, 2003. I informed the court of who I was. The social worker was not there but the court did order a paternity test for me. I was not at that time appointed an attorney. I thought that I had assurances from the court that if the blood test showed that I was the biological father that I would be given visitation.

At the November 6, 2003 proceedings on the second section 388 petition, counsel were present for Esmeralda, Anthony, Andrew, B., the Department, and Carmine and Steven, who were in the process of adopting B., and sought permission to appear as de facto parents. The Department's log records from December 2002 to October 2003 did not mention any contacts with Anthony. Davis was off on medical leave, and the social worker from the Department who came to court had no knowledge of the facts. Judge Stevens therefore found true the facts in Anthony's declaration.

Andrew's counsel expressed concern that Anthony said he learned about Andrew in December 2002, but there was documentary evidence that the

---

"15. After that first court appearance I contacted the Long Beach Genetics Laboratory as instructed but they did not have the referral and therefor [sic] would not give me an appointment. I inquired as to the cost of a DNA test and was told that it would cost more than a thousand dollars.

"16. I called and spoke to the social worker Robert Davis, I told him about my conversation with the test laboratory, the need for an immediate referral and asked him if it might be possible for me to take the test the upcoming Monday, my day off. He told me he would call me back.

"17. I waited a week, didn't get a call back so I called to leave a message on his answering machine. Two or three days later the social worker called me back to say that he would call me back in a couple of weeks.

"18. I did not get a call back so I called the office to speak to the supervisor. The receptionist put me through to the office of the supervisor but I got an answering machine. I re-connected with the receptionist who let me talk to someone who represented herself to be the supervisor's secretary who told me to call back tomorrow which I did.

"19. When I spoke to the supervisor he told me that I would have to talk to the social worker and when I asked to talk to someone higher than the supervisor he told me that there was no one higher than he was that I could talk to.

"20. By then some five weeks or so had elapsed from my first court date and it was time to return to court. At that next court date I was appointed an attorney and the court said that it would sanction the department if the DNA referral was not made.

"21. That same day, before leaving the court my attorney and I put through a call to the testing laboratory and I was told that the referral had still not gone through.

"22. On my way home from court I received a telephone [sic] from the social worker Robert Davis who told me that the referral had been made an[d] that I could call for an appointment. I called immediately and got an appointment for a Monday, my normal day off.

"23. When I returned to court a different judge was sitting. I presented my test results demonstrating that I was the biological father and I requested visitation through my attorney which the court denied saying that I had to file a 388 petition. The court did grant my request that my home be evaluated with the comment that that would move things along but that order is not reflected in the minute order.

"24. I filed a 388 petition that was heard and denied but the court invited me to file another 388 petition and this declaration is in support of that second petition.

"25. I have two other children ages 4 and 7 who are in the care and custody of their mother. I have weekend visitations with them.

"I declare under penalty of perjury the foregoing to be true and correct. Signed this 20th day of October, 2003 in the city of Monterey Park, California."

biological father had visited Andrew prior to that date. The judge questioned Anthony, who said that he first visited Andrew at the end of December 2002 or the beginning of January 2003. Esmeralda told the judge that she once took Anthony, not Martin, to visit Andrew. She did not recall the month, but it was when Andrew was "barely born." Both Esmeralda and Anthony recalled that the visit was at a Burger King restaurant in the presence of the previous foster parent, Yolanda A.

Judge Stevens requested briefing from all counsel and continued the case to December 18, 2003. Carmine and Steven were granted de facto parent status. They agreed to work with Anthony on monitored visits with Andrew. The Department was asked to investigate Anthony's background.

The Department's report for the pending proceedings on December 18, 2003, was written by a different caseworker, Amy Lambert. In a change of position, the Department now recommended that Anthony be offered family reunification services. His visits with Andrew had been appropriate. Investigation verified that he had a good relationship with his two other children and regularly paid child support to their mother. He was employed, lived by himself, and had arrangements for his mother to provide babysitting if he obtained custody of Andrew.

Briefs in opposition to Anthony's petition were filed by Carmine and Steven and by Andrew. They included a new statement, dated December 8, 2003, from the foster agency worker, Samuel-Norman. Samuel-Norman said that on August 3, 2002, the former foster parent, Yolanda A., monitored a scheduled visit between Esmeralda and Andrew. Esmeralda "brought with her a man who[m] she identified as Andrew's father." Samuel-Norman contacted the Department's caseworker, Davis, and told him the alleged father had attended this visit.

Carmine and Steven also attached a new declaration, dated December 12, 2003, from Yolanda A. She stated that she was present when Anthony and Esmeralda visited Andrew at a Burger King restaurant on an unspecified date in "August, 2002."

Andrew's written opposition to Anthony's petition requested an evidentiary hearing on Anthony's efforts to assert his parental status, based on Samuel-Norman's December 8, 2003 statement about an August 3, 2002 visit.

At the December 18, 2003 proceedings, Anthony and Esmeralda were present with counsel, along with Carmine and Steven, their counsel, and counsel for Andrew, B., and the Department. Judge Stevens indicated that, before they went on the record, the parties had gone through the files and

discussed the various factual discrepancies. Anthony had stated off the record that his first contact with the caseworker was in December 2002 or January 2003; it might have been October or earlier than November when he first visited Andrew, but he did not think so. His relationship with Esmeralda was "just casual." Esmeralda's counsel told the judge that Esmeralda had repeatedly told her she had no idea how to get in touch with Anthony before they happened to meet at the McDonald's restaurant.

Judge Stevens found that Samuel-Norman was mistaken when she said in her December 2003 statement that Anthony visited Andrew on August 3, 2002, because Samuel-Norman's more contemporaneous report of August 5, 2002, stated that the August 3, 2002 visit was by Esmeralda and the maternal grandmother. The judge recognized the conflict between Anthony's current statement that he found out about Andrew in December 2002 and his statement at the May 29, 2003 proceedings that he first learned about Andrew two months previously. The judge was unhappy with the vagueness of the facts, including inaccuracies in the reports and Anthony's lack of "a good recollection of time."

In the middle of the extensive arguments, Andrew's counsel requested a continuance to bring in Samuel-Norman and have a full evidentiary hearing. Judge Stevens denied the request on the grounds that testimony by Samuel-Norman would not resolve the discrepancies; Anthony's statements would not change if he were put under oath; and the parties had agreed when they went through the case file at the prehearing conference that nothing more needed to be done to develop the record. None of the other counsel thought a continuance was necessary.

Judge Stevens then ruled that Anthony had "difficulty with time," but was not lying. Somebody was mistaken about the August 2002 visit. The important thing was that, beginning at least in January 2003, Anthony had made repeated efforts to contact the caseworker. He had not known about the hearing in January 2003, and had even called Andrew's counsel for help. He came to the first court hearing for which he had a date, and got the DNA test as soon as the Department made the necessary referral. Most importantly, the Department ignored Anthony while the case was still in the reunification phase. Anthony had done what he was supposed to do and had been prevented by the Department from assuming the role of a parent. Therefore, the section 388 petition and request to start reunification services were granted.

At proceedings on January 28, 2004, mediation was set up to combine the plans for transition which had been prepared by the Department and by Carmine and Steven. The court was "overwhelmed" with the effort of

Anthony, Carmine and Steven to act in Andrew's best interest on visitation. It refused to stay implementation of the plan while an appeal was in progress.

Carmine and Steven filed a petition for writ of supersedeas in which Andrew joined. On March 3, 2004, this court stayed the portion of the juvenile court's previous orders that provided for the final transition of Andrew to Anthony's home, and denied the petition in all other respects.

## DISCUSSION

At the hearing on the second section 388 petition, Judge Stevens was presented with a factual morass regarding whether Anthony visited Andrew sooner than December 2002, when he said he reestablished contact with Esmeralda and learned of Andrew's existence.[5] The record and case law support the judge's determinations that Anthony had a poor memory for dates but was not lying, and his strenuous efforts to determine paternity beginning in January 2003 justified granting his petition, as he had demonstrated a full commitment to his parental responsibilities while the case was still at the reunification stage.

■ Section 388, subdivision (a) allows a parent to petition to change or modify a previous order "upon grounds of change of circumstance or new evidence." The petition must allege why the requested change is "in the best interest of the dependent child." (§ 388, subd. (b).) "[T]he burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [27 Cal.Rptr.2d 595, 867 P.2d 706].) "The petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415–416 [33 Cal.Rptr.2d 85, 878 P.2d 1297]; see also *In re Stephanie M., supra,* at p. 318.)

"Sections 366.21 and 366.22 require that if a child may not safely be returned to the child's parents within a maximum of 18 months from removal

---

[5] Possible dates for Anthony's visit included (1) August 3, 2002 (according to Samuel-Norman's December 8, 2003 written statement, even though her August 5, 2002 report said this visit was by Esmeralda and the maternal grandmother); (2) an unspecified day in August 2002 (according to the December 12, 2003 declaration by the former foster mother, Yolanda A.); (3) sometime prior to November 6, 2002 (according to Samuel-Norman's November 6, 2002 foster agency report); (4) around November 2002 (according to what Yolanda A. said in the February 5, 2003 developmental assessment by TIES for Adoption); and (5) probably no earlier than November 2002, and most likely the end of December 2002 or the first week of January 2003 (according to Anthony's written and oral statements).

from the parents' care, the trial court must terminate reunification efforts and set a section 366.26 hearing." (*Julia U.*, *supra*, 64 Cal.App.4th 532, 543.)

" '[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.' " (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447 [24 Cal.Rptr.2d 751, 862 P.2d 751] (*Zacharia D.*), quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 [19 Cal.Rptr.2d 544, 851 P.2d 826]; *Julia U.*, *supra*, 64 Cal.App.4th 532, 543.)

"[A] biological father is not entitled to custody under section 361.2, or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period, [but] he may move under section 388 for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or changed circumstances." (*Zacharia D.*, *supra*, 6 Cal.4th at pp. 454–455, fn. omitted.)

"Only a 'presumed' father, not one who is merely a 'natural' father, is entitled to reunification services." (*Julia U.*, *supra*, 64 Cal.App.4th at p. 540; *Zacharia D.*, *supra*, 6 Cal.4th at p. 451.)

■ A natural father can become a presumed father if he receives the child into his home and openly holds out the child as his natural child. (*Zacharia D.*, *supra*, 6 Cal.4th at p. 449.) However, it may be impossible for him to do so, such as where the mother prevents it, or the county department of social services has taken custody of the child. (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 807 [116 Cal.Rptr.2d 123]; see also *Kelsey S.*, *supra*, 1 Cal.4th 816, 825.) Therefore, the statutory distinction between natural fathers and unwed fathers violates the federal constitutional right to due process if it is applied to an unwed father who made a sufficient, timely, and full commitment to his parental responsibilities, absent a showing of his unfitness as a parent. (*Zacharia D.*, *supra*, at p. 450; *Kelsey S.*, *supra*, at pp. 849–850.)

"If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849; *Zacharia D.*, *supra*, 6 Cal.4th at p. 450.) The focus is on whether the natural father "has done all that he could reasonably do *under the circumstances*" to demonstrate his commitment to the child. (*Kelsey S.*, *supra*, at p. 850; see also *Julia U.*, *supra*, 64 Cal.App.4th at p. 541.)

The correctness of the trial court's rulings here is demonstrated by comparing Anthony's actions to those of the biological fathers in *Zacharia D., supra,* 6 Cal.4th at page 450, and *Julia U., supra,* 64 Cal.App.4th at pages 540–541.

*Zacharia D.* found *insufficient* efforts by the biological father on these facts: The drug-using mother, Wendy, lived with a man named Lee before and after the baby was born. Wendy initially identified Lee as the father. However, nine months before the baby's birth, she had "at least a dozen acts of sexual intercourse . . . over a two-week period" with her high school sweetheart, Javan. (*Zachariah D., supra,* 6 Cal.4th at p. 452.) Javan knew where Wendy was at all times and had no reason to think their relationship had not resulted in a pregnancy. He learned of the baby's existence and his possible paternity when Wendy left Lee and came to live with him. He came forward about four months later to request a paternity hearing, so that Wendy would not lose her baby at the 18-month review hearing. He was incarcerated for a probation violation about a month later, made no further parenting efforts, and would be unable for six months to have even a trial visit with the child. (*Id.* at pp. 439–444, 455.) The *Zacharia D.* court concluded that the facts did not entitle Javan either to custody or to reunification services. (*Id.* at p. 456.)

In *Julia U.,* Division Six of this court found *sufficient* efforts by the biological father on these facts: The 14-year-old mother, Trisha, identified a man named Jose as the baby's father. After a paternity test ruled him out, she named two other possible fathers, Rueben and Ramon. Ramon was the only one of the three who did not deny paternity. He had had little reason to think he was the father, as Trisha was promiscuous, they had only two acts of sexual intercourse during a casual relationship, and she had identified Jose as the father. Ramon was living out of state, and first contacted the caseworker a few weeks after the worker tried to reach him at his mother's house. From the first contact, he expressed a desire to have a relationship with the baby, if a paternity test showed he was the biological father. (*Julia U., supra,* 64 Cal.App.4th at pp. 541–542.) He came to court and told the same thing to the judge. The court ordered a paternity test, but terminated reunification services before the testing occurred, and later terminated Ramon's parental rights. Three or four months had passed between Ramon's request for the test and the actual test, due to an unreasonable delay by the social service department. (*Id.* at p. 543.) The *Julia U.* court reversed, as the denial of reunification services to Ramon contravened the statutory dependency scheme and denied Ramon his federal constitutional rights to due process and to parent his child. (*Id.* at p. 544.)

The facts here are more like *Julia U.* than *Zacharia D.,* as they involved timely, repeated efforts to establish paternity, which were thwarted by the

social worker. As the trial court found, Anthony came forward in a timely manner during the reunification stage, and did "all that he could reasonably do *under the circumstances*" to demonstrate his commitment to Andrew. (*Kelsey S., supra,* 1 Cal.4th at p. 850.) Although Anthony was inconsistent about dates, he established that there was no response to his repeated calls and visits to the Department's office, apparently because the caseworker was having medical problems.

Carmine and Steven maintain that Anthony cannot qualify as a *Kelsey S.* father because "there was no evidence he was thwarted by the mother in his attempts to establish a relationship with the child." They ignore Anthony's statement, which the trial court believed, that he had no way to contact Esmeralda after their relationship ended. If he could not contact the mother, he could not establish a relationship with the child. That is a major factual distinction between this case and *Zacharia D., supra,* 6 Cal.4th at page 452, where the biological father knew where the mother lived following their sexual relationship.

There are other important bases for distinguishing this case from *Zacharia D.* The biological father there lived with the biological mother, and his articulated basis for coming forward was to prevent the biological mother's impending loss of parental rights. He had a long-standing drug problem, was incarcerated for drug use, would not be able to even visit the child for six months, and had only vague plans of how he would care for him. (*Zacharia D., supra,* 6 Cal.4th at p. 455.) Here, in contrast, the Department's investigation showed that Anthony was steadily employed, had appropriate visits with Andrew, was a good father to his other two children, had a home waiting for Andrew, and had arranged for his mother to provide babysitting. Furthermore, his strenuous efforts to establish paternity showed that his motivation was a genuine and admirable commitment to the son he had fathered.

We further reject the contention by Andrew, Carmine and Steven that the trial court should have continued the case for an evidentiary hearing.

Andrew's written opposition to the second section 388 petition requested a full factual inquiry into Anthony's efforts to assert his parental status. However, Andrew's counsel did not mention an evidentiary hearing until midway through the December 18, 2003 proceedings. All the other counsel, including counsel for Carmine and Steven, told the judge that no continuance was necessary. Since arguments which are waived at the trial court level are not considered on appeal, this issue was preserved only by Andrew. (*California State Auto. Assn. Inter-Ins. Bureau v. Antonelli* (1979) 94 Cal.App.3d 113, 122 [156 Cal.Rptr. 369].)

The context of the request by Andrew's counsel is important.

Judge Stevens explained at the beginning of the hearing that the parties had gone through the case file before going on the record. In the course of a detailed presentation of the various inconsistencies, she ruled that Samuel-Norman, the foster agency caseworker, was mistaken in her December 2003 statement about a visit by Anthony on August 3, 2002, because Samuel-Norman's more contemporaneous agency report of August 5, 2002, said that the August 3, 2002 visit was by Esmeralda and the maternal grandmother. Andrew's counsel complained that she had personally spoken with Samuel-Norman, and the August 3, 2002 date came from Samuel-Norman's notes. Judge Stevens replied: "Well, counsel, she's not here." The judge gave no credibility to the notes of somebody who was not in court regarding information provided by somebody else.

Later in the hearing, Andrew's counsel requested a continuance to bring in Samuel-Norman. She further argued that the discrepancies justified a full evidentiary hearing which would include cross-examination of Anthony.

Judge Stevens expressed surprise at the continuance request, as everybody had agreed when they went through the file at the prehearing conference that nothing more could be done to develop the record.[6] She had asked the parties if Anthony should be cross-examined under oath, but that would just have produced the same information he had already given them. To continue the case was useless, as the discrepancies would remain, and there was a mistake in Samuel-Norman's notes. A continuance would be against the children's best interests, especially since the courtroom was about to be closed for two weeks.

Under the circumstances, we can find no abuse of discretion in the denial of a continuance, based on the agreement among the parties, the impossibility of resolving the issues, and the need for a prompt resolution of the case. *In re Clifton V.* (2001) 93 Cal.App.4th 1400, 1404–1405 [114 Cal.Rptr.2d 1] and *In re Matthew P.* (1999) 71 Cal.App.4th 841, 849–851 [84 Cal.Rptr.2d 269] are inapposite, as they did not involve continuance requests or agreements to proceed without the taking of testimony. If Andrew's counsel wanted live witnesses, she could have had them available at the December 18, 2003 hearing.

---

[6] Rule 1432(f) of the California Rules of Court allows proof at a section 388 hearing to be "by declaration and other documentary evidence, or by testimony, or both, at the discretion of the court," unless "(1) the request is for removal from the home of the parent or guardian or to a more restrictive level of placement or (2) there is a due process right to confront and cross-examine witnesses."

Finally, we reject the suggestion by Andrew, Carmine and Steven that the dependency court failed to consider whether it would be detrimental to Andrew's best interest to separate him from the half brother with whom he lived since birth. The record shows that the judge was concerned at all times with Andrew's best interests. She was also required, however, to consider Anthony's rights to due process and to parent his child. (*Julia U.*, *supra*, 64 Cal.App.4th at p. 544.) "The relationship of a natural parent and a child is a vital human relationship which has far-reaching implications for the growth and development of the child." (*Ibid.*) It was not against Andrew's best interest to reunify him with a fit natural parent who made a timely appearance in the case.

We also find it important that, when Anthony began contacting the caseworker, Andrew had not been in the foster home of Carmine and Steven for an extended period of time. This case is not like *In re Jasmon O.*, *supra*, 8 Cal.4th 398, 407, in which the seven-and-a-half-year-old child had resided with the foster parents since she was a six-month-old infant.[7] Andrew was removed from his original foster home and placed with Carmine and Steven in March 2003. An immediate response to Anthony by the Department would have given little time for Andrew to bond with Carmine and Steven. When the second section 388 petition was granted in December 2003, Andrew had lived with Carmine and Steven for only nine months. The delay since then results from the decision of Andrew, Carmine and Steven to pursue the appeal.

## CONCLUSION

There was substantial evidence that Anthony asserted his parental rights within a reasonable time of learning of Andrew's existence, was a fit parent, and had his due process rights violated by the Department's dilatory behavior. Therefore, the trial court properly exercised its discretion when it granted his petition for modification and request for reunification services.

Hopefully the efforts of Anthony, Carmine and Steven to work together will continue, for the benefit of both Andrew and B. We also hope that the Department's caseworkers will pay attention to contacts from possible biological parents in the future.

---

[7] At the oral argument, Andrew presented as additional authority *Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51 [86 Cal.Rptr.2d 7] and *Adoption of Daniele G.* (2001) 87 Cal.App.4th 1392 [105 Cal.Rptr.2d 341]. They also are inapposite, as they involved guardianship proceedings by couples with whom the children had been placed since birth.

## DISPOSITION

The orders of the juvenile court are affirmed. The stay which was imposed by this court on March 3, 2004, is vacated. The writ of supersedeas is discharged. .

Rubin, J., and Boland, J., concurred.

A petition for a rehearing was denied October 8, 2004, and the petitions of appellants Steven B. and Carmine S. and minor Andrew L. for review by the Supreme Court were denied December 15, 2004.